**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**SOUTHERN DIVISION**

| | |
|---|---|
| KELLY JORGENSEN,<br><br>                Plaintiff,<br><br>    v.<br><br>UNITED COMMUNICATIONS GROUP<br>LIMITED PARTNERSHIP, *et al.*<br>                Defendants. | Action No. 8:10-CV-00429-AW |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff Kelly Jorgensen' Motion for Partial Summary Judgment, Defendants' Motion for Summary Judgment, and Defendants' motion to strike Plaintiff's supplement to Plaintiff's reply memorandum. *See* Doc. Nos. 25, 28, 37. The parties have fully briefed these Motions, and the Court finds that no hearing is necessary. *See* Md. Loc. R. 105(6) (D. Md. 2010). For the reasons stated below, the Court will **DENY** Plaintiff's motion for partial summary judgment, **DENY IN PART** and **GRANT IN PART** Defendants' motion for summary judgment, and **GRANT** Defendants' motion to strike.

## I.  FACTUAL & PROCEDURAL BACKGROUND

### A.  Consulting Agreement

This case involves a contract dispute between Mr. Kelly Jorgensen ("Plaintiff") and United Communications Group Limited Partnership ("UCG") and CCB II, LLC ("CCB") ("Defendants"). UCG was the parent company of CCB.[1] Plaintiff and the other two principals of Custom Coding Books, LLC sold the company to CCB on August 31, 2007. On the same day, and as part of the same transaction, CCB and Plaintiff entered into a Consulting Agreement

---

[1] On August 1, 2010, CCB sold all of its assets to Ingenix, Inc., terminated its employees, and no longer conducts any business.

under which CCB retained Plaintiff to provide professional services to CCB.  Plaintiff's duties included developing, creating, and producing products for CCB, using his best efforts to promote its success, and cooperating to advance its best interests.  *See* Doc. No. 25, Ex. 1, Schedule A.  One of the relevant terms of the agreement was a confidentiality covenant that stated Plaintiff shall "maintain in confidence and shall not, without the prior written consent of the Company, use, except in connection with the provision of Services hereunder or by court order, disclose or give to others any Confidential Information."  Doc. No. 25, Ex. 1 § 4.3.

UCG guaranteed CCB's payment obligations to Plaintiff under the Consulting Agreement through the execution of a Guaranty and Covenant of United Communication Group, Limited Partnership ("Guaranty") on August 31, 2007.  In exchange for his services, Plaintiff would receive $12,700 per month until CCB achieved a positive gross margin for three consecutive months, at which time the monthly payments would increase to $13,950.  *See* Doc. No. 25, Ex. 1, Schedule B.  The Consulting Agreement also specified Plaintiff's entitlement to annual bonuses, a term bonus, and compensation upon termination.  *See id.*  CCB could offset any amounts owed to Plaintiff under the Consulting Agreement by all amounts Plaintiff owed to UCG under the Promissory Note, which is discussed below.  *See id.*

The Consulting Agreement was for a period of five years unless terminated by either party pursuant to its termination provisions. *See* Doc. No. 25, Ex. 1 § 8.  The agreement would be terminated upon the first to occur of the following:

(i) upon the death of Jorgensen;
(ii) the Disability of Jorgensen immediately upon notice from the Company to Jorgensen;
(iii) For Cause, immediately upon notice of termination from the Company to Jorgensen, or at such later time as such notice may specify;
(iv) For Good Reason upon not less than 30 days' prior notice of termination from Jorgensen to the Company;

(v) Without Cause, upon not less than 30 days' prior notice of termination from the Company to Jorgensen; or

(vi) Without Good Reason, upon not less than 30 days prior written notice of termination from Jorgensen to the Company.

*Id.* § 8.2(a).  As defined in the agreement, "For Cause" means:

> (A) the material failure of Jorgensen to perform his duties under this Agreement or a material breach of any *other term* of this Agreement by Jorgensen, which failure or breach is not cured within 30 days after written notice thereof (B) the appropriation (or attempted appropriation) of a material business opportunity of the Company . . . ; (C) the misappropriation (or attempted misappropriation) of any of the Company's funds or property; or (D) the conviction of or the entering of a guilty plea or plea of no contest with respect to a non-motor vehicle related felony, crime of moral turpitude, or the equivalent thereof.

*Id.* 8.2(b)(ii).

Pursuant to the Consulting Agreement's non-compete clause, if Plaintiff terminated the agreement for "Good Reason" or CCB terminated it "Without Cause," the agreement's non-compete covenant would end one year from the termination date.  *See id.* § 3.2.  If the agreement was otherwise terminated, the non-compete covenant would end three years from the termination date.  *See id.*  The covenant protected CCB as well as DecisionHealth, an operating unit of UCG.  *See id.*  Other relevant provisions include an integration clause and a "No Waiver of Rights, Powers and Remedies" clause, which provides that "the election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies."  *Id*. §§ 10.1, 10.12.

### B.  Promissory Note

Defendants extended a loan in the amount of $90,000 from UCG on July 12, 2007.   On this same date, UCG and Plaintiff executed a Promissory Demand Note setting forth the terms of UCG's $90,000 loan to Plaintiff.  The Parties executed a Replacement Promissory Note ("Promissory Note") on August 31, 2007.  The principal balance and interest of the note was due

"upon the first to occur of (i) payment to Maker of the Term Bonus (as defined in the Consulting Agreement), or (ii) termination of the consulting arrangement between Maker and CCB pursuant to Section 8 of the Consulting Agreement." Doc. No. 6, Ex. 1 ¶ 2. The note also provided that UCG could "offset dollar for dollar against any and all amounts owed to [Plaintiff] under the Consulting Agreement all amounts then due to [UCG] under this Promissory Note." *Id.* ¶ 6.

### C. Termination

Defendants terminated Plaintiff for his allegedly improper behavior related to the use of proprietary information and booking of orders as well as his creation of a hostile work environment. *See* Doc. No. 25, Ex. 3. The booking of orders occurs when sales employees enter customer orders into the sales system. The result of improperly booking orders is an overstatement of the company's financial performance. CCB has no written policies or procedures regarding the booking of customer orders. *See* Doc. No. 25, Ex. 7 ¶ 14. Defendants assert that they follow the common industry practice of not booking revenues related to a customer order until the sale has been finalized. *See id.* Plaintiff, however, states that the common practice at CCB and in the industry is to book orders when one of four conditions were met: "1) receipt of an email confirmation from the client to proceed; (2) receipt of a purchase order number; (3) receipt of a signed contract; or (4) payment." *Id.*, Ex. 8 ¶ 5.

The proprietary information at issue was twenty-two lead sheets containing potential customers, which were possessed by Mr. Gene Kraemer, an employee of CCB. Mr. Kraemer acquired the lead sheets, which were created in 1999 or 2000, while he was previously employed by CodeCorrect. *See* Doc. No. 33, Ex. 9, ¶¶ 7-8. UCG purchased CodeCorrect in 2004 and subsequently sold it, and all of its proprietary leads, to Accuro Healthcare Solutions in 2006. *See* Doc. No. 28, Ex. A, ¶ 12. As part of the sale, CCB was provided with a list of CodeCorrect

customers with whom CCB could not do business. Plaintiff was responsible for maintaining the CodeCorrect customer list.

Defendants received reports of Plaintiff's allegedly improper behavior from Ms. Aimee Mamich, one of Defendants' employees, in October 2009. Ms. Mamich reported the allegations to Ms. Doreen Bieryla, president and chief executive officer of DecisionHealth,[2] through e-mails and phone calls. Ms. Mamich's October 19, 2009 e-mail and attached letter accused Plaintiff of creating a hostile work environment, instructing employees to book orders that were not finalized, and planning to use proprietary information. *See id.*, Exs. 4-5.

In response to Ms. Mamich's allegations, Ms. Bieryla conducted an investigation that included interviews with three employees—Ms. Bell, Ms. Regan Bode, and Mr. Dylan Howerter. Two of the employees addressed Plaintiff's alleged creation of a hostile work environment. Ms. Bode stated that Plaintiff "yelled at the staff and treated them poorly." Doc. No. 28, Ex. F ¶ 10. Mr. Howerter claimed that Plaintiff "spoke negatively of the people at DecisionHealth's and UCG's headquarters." *Id.* ¶ 11.

Based on Ms. Bieryla's investigation, Defendants determined that retaining Plaintiff was not in their best interest. *See* Doc. No. 28, Exs. A ¶ 20, G ¶ 13. Subsequently, during a meeting at UCG's headquarters on October 29, 2009, Defendants informed Plaintiff that he was being terminated for cause. Plaintiff did not receive written notice prior to the meeting or during the meeting. *See* Doc. No. 25, Ex. 2 ¶ 3. In response to a November 6, 2009 email from Plaintiff, UCG sent a letter, dated November 18, 2009, to Plaintiff describing the reasons for his termination. *See id.*, Ex. 3. The reasons included the following two alleged breaches of the Consulting Agreement by Plaintiff: 1) he was party to a plan to use proprietary leads and

---

[2] CCB was a wholly owned subsidiary of DecisionHealth, and UCG is the parent company and full owner of DecisionHealth.

customer information from another company that were provided by Gene Kraemer, a former employee of that company and CCB, and 2) he was "party to the booking of revenue related to customer orders that had yet been finalized for the purpose of over-stating the Company's financial performance." *Id.* The letter noted that the breaches raised serious concerns about Plaintiff's integrity and were not "curable." *See id.* In addition to the two alleged breaches, the letter stated that Plaintiff's creation of a hostile work environment was an additional factor for the termination. *See id.* This factor, however, was "likely curable" according to the letter. *Id.*

On August 4, 2010, Plaintiff notified Defendants that CCB had materially breached the Consulting Agreement and that the agreement would be terminated unless all of the breaches were cured within thirty days of the letter. *See* Doc. No. 28, Ex. I. Those alleged breaches included Defendants' failure to pay monthly consulting fees, failure to pay annual bonuses, failure to provide thirty days notice of alleged material breaches and an opportunity to cure them, and termination of employees and discontinuation of products and services upon which Plaintiff's benefits under the Consulting Agreement were based. *See id.* In a letter dated August 12, 2010, Defendants responded by reiterating the reasons for Plaintiff's termination, denying the breaches alleged in Plaintiff's letter, and informing Plaintiff that several provisions of the Consulting Agreement were still in effect. *See id.*, Ex. J. On September 13, 2010, Plaintiff provided Defendants notice that "the Consulting Agreement is terminated." *Id.*, Ex. K.

**D. Procedural History**

Based on the aforementioned events, on February 22, 2010, Plaintiff filed a complaint, which was amended on March 29, 2010, seeking a declaration that Defendants breached the Consulting Agreement and that the post-termination covenants in the Consulting Agreement are null and void. *See* Doc. Nos. 1, 8. Subsequently, on September 20, 2010, Plaintiff filed a motion

for partial summary judgment on his breach of Consulting Agreement and breach of Guaranty claims as to liability, summary judgment on his request for declaratory judgment regarding the post-termination provisions, and summary judgment on Defendants' counterclaim. *See* Doc. No. 25. Defendants filed a motion for summary judgment on all claims on October 27, 2010. *See* Doc. No. 28. On January 4, 2001, Defendants also filed a motion to strike Plaintiff's supplement to Plaintiff's reply memorandum. *See* Doc. No. 37.

### A. Motion to Strike

As a preliminary matter, the Court will address Defendants' Motion to Strike Plaintiff's supplemental to their reply memorandum. The Court finds that Plaintiff's Supplement to Plaintiff's Reply Memorandum is a surreply because it raises new facts and arguments in response to Defendants' Reply Memorandum. The Court does not normally permit surreplies unless it grants leave to file a surreply. *See* Local Rule 105.6 (D. Md. 2011). Since Plaintiff did not request leave to file his surreply, the Court will grant Defendants' motion to strike.

## II.    STANDARD OF REVIEW

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The Court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (*citing Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).

To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See*

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A disputed fact presents a genuine issue "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson,* 477 U.S. at 248. Although the Court should believe the evidence of the nonmoving party and draw all justifiable inferences in his or her favor, a party cannot create a genuine dispute of material fact "through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985).

## III.    ANALYSIS

### A.  Breach of Contract

#### 1. *Exclusivity of Termination Provision*

Plaintiff argues that CCB materially breached the Consulting Agreement by terminating him without giving him 30 days to cure the material breaches of the agreement, as required by the agreement. However, Defendants argue that the termination provisions in the Consulting Agreement were not exclusive, and therefore, Defendants were entitled to terminate the plaintiff for any cause that was material and went to the essence of the contract, obviating the need to give notice and an opportunity to cure. Plaintiff directs the Court to section 8.2(a)(iii) of the Consulting Agreement, the provision under which Plaintiff claims he was terminated. Under this section, Plaintiff could be terminated "[f]or cause, immediately upon notice of termination from the Company to Jorgensen, or at such later time as such notice may specify." (Doc. No. 25-1, at 11). Plaintiff directs the Court to the "For Cause" and "Cause" definitions as they are defined in Section 8.2(b)(ii) of the Consulting Agreement, defining the term as "the material failure of Jorgensen to perform his duties under this Agreement or a material breach of any other term of this Agreement by Jorgensen, which failure of breach is not cured within 30 days after written notice thereof." *Id.*

Maryland courts interpret contracts objectively, focusing on the plain meaning of unambiguous terms. *Storetrax.com, Inc. v. Gurland*, 895 A.2d 355, 367 (Md. Ct. Spec. App. 2006). When construing a contract, courts will interpret the contract as a whole and give effect to each provision. *Walker v. Dep't of Human Res.*, 842 A.2d 53, 421 (Md. 2004). In the case of a termination provision, Maryland courts have held that "it is a cumulative remedy of termination for 'a breach which is material, or which goes to the root of the matter or essence of the contract'" unless the provision is expressly exclusive. *Storetrax*, 895 A.2d at 368 (quoting *Foster-Porter Enters., Inc., v. De Mare,* 81 A.2d 325, 333 (Md. 1951)); *see Tricat Indus., Inc. v. Harper*, 748 A.2d 48, 60 (Md. Ct. Spec. App. 2000).

Having reviewed the Consulting Agreement and Maryland case law interpreting termination provisions, the Court finds that the termination provision in the Consulting Agreement, section 8.2, is not exclusive. Although the provision identifies six situations in which the agreement shall be terminated, including "for cause," it does not expressly state that these six situations are the exclusive bases under which an employee can be terminated. The four situations identified in the "for cause" definition are also not exclusive. One "for cause" situation is "the material failure of Jorgensen to perform his duties under this Agreement or a material breach of any other term of this Agreement by Jorgensen, which failure or breach is not cured within 30 days after written notice thereof." § 8.2(b)(ii). The Maryland Court of Special Appeals found that similar language was not exclusive in *Storetrax* because "there could be actions that constitute a material breach or failure of performance under the Agreement, which are not continuing, *i.e.,* capable of being cured." 895 A.2d at 360, 370 n.2 (considering a provision in which one of the six "cause" situations was "a material continuing breach by the Employee of any covenant or condition hereunder or a material failure of performance by the

Employee under this Agreement following written notice to Employee of such material continuing breach or material failure and failure by the Employee to cure the same within thirty (30) days of such notice"); *see also Tricat Indus.*, 748 A.2d at 60 (finding provision in which one of the two bases of for cause termination was "breach [of] any material provisions of this Agreement" was not exclusive). Therefore, the termination provision does not exclude the common law right to terminate the contract for a material breach that is not curable.

The Court finds Plaintiff's other arguments regarding exclusivity insufficient to warrant granting the plaintiff partial summary judgment. First, the Consulting Agreement's integration clause is not determinative of the exclusivity of the termination provision. The presence of a similar clause in the contract in *Storetrax* had no bearing on the court's holding. *See* 895 A.2d at 360. Second, the Court rejects Plaintiff's argument that the provision stating that "the election of any remedy by a party hereto shall not constitute a waiver of the right of such party to pursue other available remedies" is not relevant to exclusivity. § 10.12. In *Tricat Industries*, the court referred to a similar provision as a basis for finding that the termination clause was not exclusive. *See* 748 A.2d at 61 (noting that the termination right "did not preclude any other *legal relief or remedy* available to any party.") (emphasis added). Finally, the Court finds that Defendants' reference to section 8.2 in a letter explaining the reasons for Plaintiff's termination does not preclude Defendants from asserting that the termination was not done pursuant to that section. *See Storetrax*, 363-64, 370 (deciding the basis of termination without reference to letter citing the specific termination sections of the agreement).[3] As the termination provision in the Consulting Agreement is not exclusive, the Court believes that there is a genuine dispute of material fact as

---

[3] Plaintiff also argues that Defendants are precluded from asserting that the termination was done pursuant to section 8 of the Consulting Agreement based on Defendants' counterclaim of breach of the promissory note. Regardless of Defendants' termination, however, Plaintiff himself terminated the agreement pursuant to section 8, as required by the Promissory Note.

to whether Defendant materially breached the consulting agreement by failing to give Plaintiff

30 days notice and an opportunity to cure Plaintiff's alleged breach of the agreement.

Accordingly, the Court **DENIES** summary judgment as to COUNTS I and II of Plaintiffs'

Motion for Partial Summary Judgment.

### 2. *Defendants' Termination of the Consulting Agreement*

Defendants argue that they are entitled to summary judgment on all of the claims in

Plaintiff's Amended Complaint, claiming "CCB was permitted to terminate the Consulting

Agreement for any cause that [was] material and [went] to the essence of the contract," and they

were not required to give Plaintiff thirty day notice of his termination and an opportunity to cure

any alleged breach of the agreement. (Doc. No. 28-2, at 11). Although the Consulting

Agreement is not an employment contract, the law regarding employment contracts is

informative. An employer may discharge an employee for just cause, which "varies with the

nature of the employment." *Tricat Indus.*, 748 A.2d at 62. Just cause may include an employer's

loss of faith and trust in an employee when the employee's position requires such traits, or an

employee's incompatible behavior, even if it does not injure the employer's business. *Shapiro v.

Massengill*, 661 A.2d 202, 211 (Md. Ct. Spec. App. 1995). The employer has the burden of

proof to show just cause for the termination. *Himes Assocs., Ltd. v. Anderson*, 943 A.2d 30, 50

(Md. Ct. Spec. App. 2008).

Courts and juries generally should not interfere with business decisions. *Towson Univ. v.

Conte*, 862 A.2d 941, 945 (Md. 2004). "[T]he proper role of the jury is to review the *objective*

motivation, *i.e.,* whether the employer acted in objective good faith and in accordance with a

reasonable employer under similar circumstances when he decided there was just cause to

terminate the employee." *Id.* at 950. The jury should not assess "whether the factual bases for

termination actually occurred or whether they were proved by a preponderance of the evidence submitted for its review." *Id.* Rather, the jury should focus on "whether an employer's termination was based upon any arbitrary, capricious, or illegal reason, or on facts not reasonably believed to be true by the employer." *Id.* Although courts should not second-guess an employer's personnel decisions, *id.* at 945, a court may determine whether an employer terminated an employee for the reasons the employer cites as for cause. *Himes Assocs.*, 943 A.2d 51.

Defendants argue that their termination of Plaintiff was objectively reasonable. As previously discussed, Defendants could terminate Plaintiff for cause for either a material breach that was curable but not cured within thirty days after receiving written notice, pursuant to section 8 of the Consulting Agreement, or a material breach that was not curable. With regard to Defendants' termination of Plaintiff based on his alleged creation of a hostile work environment, the Court finds it unnecessary to determine whether the termination was objectively reasonable, as Defendants acknowledged that Plaintiff's acts were "likely curable" in their November 18, 2009 letter. (Doc. No. 25-4, at 2). While Defendants may have potentially breached section 8 of the Consulting Agreement by not providing Plaintiff notice of the alleged breach and an opportunity to cure it, this possible breach does not end the inquiry into whether their termination of Plaintiff was proper. If one of Plaintiff's other alleged breaches is material and not curable, and Defendants' termination of Plaintiff based on the breach was objectively reasonable, Defendants properly terminated Plaintiff and did not breach the Consulting Agreement.

The Court finds that Plaintiff's other two alleged breaches, which related to Plaintiff's knowledge and use of proprietary information and booking of revenue from orders that had not been finalized, were material and not curable. These alleged breaches went to the essence of the

contract because they related to Plaintiff's obligations under the confidentiality covenant and

Plaintiff's duty to promote the success of CCB. In addition, the alleged breaches caused

Defendants to question Plaintiff's integrity and trustworthiness, which may constitute just cause.

Although Plaintiff argues that the alleged breaches had already been cured through the

destruction of the lead sheets and the completion or cancellation of the orders, Defendants' loss

of faith and trust in Plaintiff was reasonably deemed to be incurable.

Thus, the remaining issue for the Court to address is whether Defendants' determination

that they had just cause to terminate Plaintiff, based on the two remaining alleged breaches, was

in objective good faith and was a decision that a reasonable employer would make. As support

for their argument that Plaintiff's termination was objectively reasonable, Defendants point to

Ms. Mamich's allegations of improper acts by Plaintiff and Ms. Bieryla's investigation of those

allegations, which lasted less than one month. The investigation included interviews with three

employees, two of which only relate to Plaintiff's creation of a hostile work environment. The

third interview, which was with Ms. Bell, addressed the alleged improper booking and use of the

lead sheets. The investigation also included a call with Plaintiff on October 23, 2009.[4] Based on

the relevant facts described below, the Court finds that a genuine issue of material fact exists

regarding whether Defendants' termination of the plaintiff was objectively reasonable.

A genuine issue exists regarding the objectivity and reasonableness of Defendants'

termination of Plaintiff for his alleged improper booking of orders. Plaintiff calls into question

Defendants' reliance on statements made by Ms. Mamich and Ms. Bell as a basis for the

termination. Ms. Mamich alleged that Plaintiff and/or Korey Jorgensen pressured at least three

sales associates, including herself, Ms. Bell, and Ms. Reinhardt, to enter orders that had not been

---

[4] Although Defendants stress Plaintiff's failure to deny the allegations at the October 29, 2009 meeting, Defendants had already decided to terminate Plaintiff prior to the meeting so the Court does not consider it part of the investigation.

finalized into the sales database. Ms. Mamich documented these allegations in an e-mail response to questions posed by Ms. Bieryla, but the response did not address Ms. Bieryla's questions about who instructed her to enter the orders and who responded when she objected. Ms. Bieryla also contacted Ms. Bell, who stated that she had "little to no contact with [Plaintiff]" and indicated that Korey Jorgensen, not Plaintiff, recommended that she enter a large order before the paperwork was completed.[5] Doc. No. 33, Ex. 15. Ms. Bieryla did not contact Ms. Reinhardt. In addition, during the October 23, 2009 call with Plaintiff, Ms. Bieryla and other representatives of Defendants did not mention the alleged improper booking. Additionally, a dispute exists regarding whether the alleged improper booking of orders violated company policy or common industry practice.

Moreover, a genuine issue exists regarding whether Defendants' termination of Plaintiff based on his alleged knowledge and use of Mr. Kraemer's lead sheets was objectively reasonable. In making the termination decision, Defendants relied on Ms. Mamich's allegations, Ms. Bieryla's interview with Ms. Bell, and their October 23, 2009 call with Plaintiff. In her October 19, 2009 e-mail to Ms. Bieryla, Ms. Mamich stated that Korey Jorgensen told Ms. Bell, Mr. Kraemer, and her that he was going to distribute the lead sheets to all of the sales reps representatives. Ms. Bieryla discussed the October 19 meeting with Ms. Bell, who allegedly confirmed that Korey Jorgensen "announced that they'd be getting new leads . . . and not to bring up Gene's name since they were Gene's accounts from a previous company."[6] Doc. No. 33, Ex. 15. Both parties agree that Plaintiff was not present at the October 19 meeting.

---

[5] Ms. Bell disputes the accuracy of this statement, but it is not relevant since it relates to Korey Jorgensen rather than Plaintiff.
[6] Ms. Bell claims that this quote is misstates what she said, but it is not relevant since it relates to Korey Jorgensen rather than Plaintiff.

Thus, the only allegation specifically involving Plaintiff is Ms. Mamich's statement that he was present during another meeting in which Korey Jorgensen said he wanted her to use the lead sheets. According to Ms. Mamich, Plaintiff said "don't tell her that," and told his brother to tell Mamich that the lead sheets had been found in the trash. Doc. No. 25, Ex. 6. Ms. Mamich acknowledged that she never saw the lead sheets and did not know what information they contained. Ms. Bell also asserts that, during their October 20, 2009 call, she told Ms. Bieryla that she was never given the lead sheets and never heard Plaintiff mention the lead sheets.

The final component of Defendants' investigation was a telephone call to Plaintiff on October 23, 2009. While Plaintiff notes that the call only lasted four minutes and occurred while he was on a golf course during a vacation, Defendants maintain that Plaintiff never indicated that he was not able to discuss the issue at that time. During the call, Defendants spoke with Plaintiff about his possession, knowledge, and potential use of proprietary leads. Defendants claim that they referred to the proprietary leads obtained by Mr. Kraemer during the call and that Plaintiff "never denied having had possession, or knowledge that other people in the office had possession, of" the lead sheets. Doc. No. 28, Ex. F ¶ 12. Plaintiff argues that he assumed Ms. Bieryla was referring to the CodeCorrect customer list rather than the lead sheets and that he called Ms. Bieryla on October 26, 2009 to clarify the matter. After Ms. Bieryla explained that Defendants were referring to Mr. Kraemer's list (*i.e.,* the lead sheets), Plaintiff replied that it was not a list but papers that Mr. Kraemer had given Korey Jorgensen and that he had no idea which or how many accounts were in the papers. Thus, as support for their termination of Plaintiff, Defendants stress that Plaintiff did not deny knowing about the lead sheets during the call and that Plaintiff's statement characterizing the list as papers indicates that Plaintiff was aware of the lead sheets.

Given the facts alleged by both parties regarding the investigation into the Plaintiff's use and possession of propriety information, the Court finds that a genuine issue of material fact exists regarding whether Defendants' termination of Plaintiff for just cause was made in objective good faith and consistent with a reasonable employer's actions. Therefore, the Court will **DENY** Summary Judgment as to the Defendant on Counts I and II of the Amended Complaint.

### 3. *Plaintiff's Obligations under the Non-Competition Provision*

Both parties move for summary judgment on Count III of Plaintiff's Amended Complaint, in which the plaintiff seeks a declaratory judgment declaring that "the material breaches of the Consulting Agreement committed by CCB and UCG excuse Plaintiff from his obligations under the covenant not to compete." (Doc. No. 25-1, at 27).

If the Court finds that Defendants materially breached the Consulting Agreement, Plaintiff's non-compete obligations under the agreement are discharged. *See Jay Dee/Mole Joint Venture v. Mayor and City Council of Baltimore*, 725 F.Supp.2d 513, 528 (D. Md. 2010) ("a material breach discharges the non-breaching party of its duty to perform"). If, however, the Court finds that Defendants did not materially breach the Consulting Agreement, the Court must determine whether the non-compete covenant is enforceable against Plaintiff. In the discussion above, the Court has already found that there is a genuine dispute of material fact as to whether the defendants breached the Consulting Agreement at issue in this case, and therefore the Court declines to grant summary judgment on Count III to either party based on any alleged breach of the Consulting Agreement.

In Count III, Plaintiff also contends that the post-termination covenants in Sections 3 and 4 of the Consulting Agreement should be declared null and void. Plaintiff argues that the

covenant should not be enforced because it is not "'reasonably necessary for the protection of the business of the employer.'" *Becker v. Bailey*, 299 A.2d 835, 838 (Md. 1973) (quoting *Ruhl v. Bartlett Tree Co.*, 225 A.2d 288, 291 (Md. 1967)). Specifically, Plaintiff states that Defendants no longer have a protectable interest because CCB sold all of its assets and discontinued the business. The non-compete covenant, however, protects the interests of CCB as well as DecisionHealth, an operating unit of CCB's parent, UCG. Although the extent of Defendant CCB's interest in enforcing the non-compete covenant is arguable, enforcement of the covenant still protects the interests of DecisionHealth, and thus UCG. Therefore, the Court finds that, in the absence of a material breach by Defendants, the non-compete covenant is enforceable against Plaintiff.

Therefore, the Court **DENIES** Summary Judgment as to Plaintiff in Count III, and the Court **GRANTS-in-PART** and **DENIES-in-PART** Summary Judgment as to Defendants in Count III, finding that there is a genuine dispute of material fact as to whether Defendant's alleged breach discharges Plaintiff from his obligations to comply with the post-termination covenants in the Consulting Agreement but that the post-termination covenants are otherwise enforceable.

### B. Breach of Promissory Note

Defendants have filed a counterclaim against the Plaintiff for breach of the Promissory Note in this case, and Defendants move for summary judgment on their Counterclaim. Defendants extended a loan to Plaintiff pursuant to the terms of the Promissory Note. The parties do not dispute that Plaintiff has not repaid Defendants the loan that they extended him, but Plaintiff contends that he is not obligated to repay the amounts due under the promissory note because Defendants have materially breached the Consulting Agreement. The Court finds that

Plaintiff's obligations under the Promissory Note were triggered by Plaintiff's termination of the Consulting Agreement pursuant to section 8 on September 13, 2010.  Although Defendants terminated the Agreement on October 29, 2009, the termination was not pursuant to section 8 as required by the Promissory Note.  On August 4, 2010, Plaintiff notified Defendants that Defendants had materially breached the Consulting Agreement and that the agreement would be terminated if the breach was not cured within thirty days.  Consistent with section 8.2(a)(4), Plaintiff terminated the agreement by letter dated September 13, 2010.  Thus, Plaintiff terminated the Consulting Agreement pursuant to section 8 as required by the Promissory Note.

Plaintiff also argues that Defendants' breach of the Consulting Agreement discharges his obligations under the Promissory Note because the two agreements are interrelated.  As noted by the Fourth Circuit when applying Virginia law, "[u]ntil it appears that the several writings are part of a single transaction, either from the writings themselves or by extrinsic evidence, courts should not read the writings together as one contract because the same parties may have had more than one transaction in one day of the same general nature."  *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614, 626 (4th. Cir. 1999).  Given the lack of Maryland law specifically addressing "when two or more agreements should be considered one integrated contract," the Court finds it instructive to follow the Fourth Circuit's reference to a three-prong test articulated in *In re Plitt Amusement Co.,* 233 B.R. 837 (Bankr. C.D. Cal. 1999).  *In re Driggs*, 55 F.App'x 618, 620 (4th Cir. 2003).  Applying the test in *In re Driggs*, the Circuit Court found that a lease and invoice were separate contracts because: 1) their nature and purposes were different, 2) the consideration was distinct, and 3) the parties' obligations under the agreements were not interrelated.  *See* 55 F.App'x at 620-21.[7]  Based on these factors and for the reasons articulated

---

[7] The Fourth Circuit did not mention the presence or absence of an integration clause in *In re Driggs*.  In *In re Plitt*, the court stated that the presence of an integration clause was a separate issue from whether two agreements should

below, the Court finds that the Consulting Agreement and Promissory Note are two separate agreements.  As such, Defendants' alleged breach of the Consulting Agreement does not relieve Plaintiff of his obligations under the Promissory Note.  *See id.* at 621.

First, the Promissory Note's purpose, which is to set forth the terms of Defendants' loan to Plaintiff, differs from the Consulting Agreement's purpose, which is to identify the terms of Defendants' retention of Plaintiff to perform professional services.  Unlike the promissory note and distributor agreement in *Carvel Corp. v. Diversified Management Group, Inc.*, 930 F.2d 228, 233 (2d. Cir. 1991), which were treated as a single contract, the Promissory Note was not executed for the sole purpose of making payments under the Consulting Agreement.  In addition, the agreements had different timeframes.  *See In re Plitt*, 233 B.R. at 843.

Second, the parties have not indicated that any of the consideration for the Consulting Agreement was also consideration for the Promissory Note, or vice versa.  Under the Consulting Agreement, Defendants agreed to pay Plaintiff in exchange for Plaintiff providing services to Defendants.  The Promissory Note was a separate exchange in which Plaintiff agreed to pay Defendants' interest for the loan Defendants made to Plaintiff.

Finally, the parties' obligations under the Consulting Agreement were not interrelated with the parties' obligations under the Promissory Note.  Although the agreements referenced each other, they did not incorporate each other's substantive or material terms.  *See In re Driggs*, 55 F.App'x, at 620; *In re Plitt*, 233 B.R. at 845.  The Consulting Agreement's only reference to the Promissory Note is an offset provision, which has the sole purpose of settling any future payments.  *See In re Plitt*, 233 B.R. at 845 (stating that the offset provision did not support an

---

be considered one.  233 B.R. at 845.  In contrast, in *In re Abitibibowater Inc.*, the court noted that "[u]nder both New York and Georgia law, the presence of an integration clause undermines the argument that two separate agreements are one."  418 B.R. 815, 826 (Bankr. D. Del. 2009).  Although the Consulting Agreement contains an integration clause, section 10.1, the Court need not resolve its relevance.

inference that one agreement was integrated with another agreement).  The same is true of the Promissory Note's offset provision referencing the Consulting Agreement.  The Promissory Note's only other reference to the Consulting Agreement is in the definition of its term— payment under the note is due upon payment of a term bonus or termination of the Consulting Agreement.  The Consulting Agreement's terms regarding payment of the term bonus and termination, however, are not incorporated into the Promissory Note.  Moreover, neither agreement contains cross default provisions or addresses the implications of a failure to perform under one agreement on performance under the other agreement.  *See In re Driggs*, 55 F. App'x at 621 (stating that the absence of a cross-default provision mandated the conclusion that the agreements were independent); *see also Carvel Corp.*, 930 F.2d at 233 (treating agreements as a single contract because "the notice and cure provisions of the [distributorship] agreement deal specifically with the consequences of [] failure to make timely payments" under the promissory note).

Since Defendants' and Plaintiff's claims arise out of separate transactions, each party has a right to set-off.  *Imbessi v. Carpenter Realty Corp.*, 744 A.2d 539, 552 (Md. 2000) (defining "'setoff'" [as] a diminution or a complete counterbalancing of the adversary's claim based upon circumstances arising out of a transaction other than that on which the adversary's claim is based").  In Maryland, this right is the "'right which exists between two parties, each of whom, under an independent contract, owes an ascertained amount to the other, to set off their respective debts by way of mutual deduction, so that, in any action brought for the larger debt, the residue only, after such deduction, shall be recovered.'"  *Ghingher v. Fanseen*, 172 A. 75, 78 (Md. 1934) (citation omitted).  Upon final resolution of this case, Defendants are entitled to set-off any amount they may owe to Plaintiff by the amount Plaintiff owes to Defendants under the

Promissory Note and any other relief the Court finds appropriate. Likewise, Plaintiff is entitled to set-off the amount he owes to Defendants by any amount the Court may find Defendants owes to Plaintiff. Accordingly, Summary Judgment is **GRANTED** as to Defendant on their Counterclaim.[8]

## IV.    CONCULSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion for partial summary judgment, **DENIES IN PART** and **GRANTS IN PART** Defendants' motion for summary judgment, and **GRANTS** Defendants' motion to strike. A separate Order will follow.

    August 25, 2011                              /s/
         Date                          Alexander Williams, Jr.
                                       United States District Judge

---

[8] The Court will issue Defendant's judgment on their Counterclaim upon the final disposition of this case.